IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal No. **3:10-CR-056-L** |
| | § | |
| **TARSL DIXON** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Tarsl Dixon's Motion to Suppress Evidence, filed August 2,

2010. After carefully considering the motion, response, record, and applicable law, the court **grants**

Defendant Tarsl Dixon's Motion to Suppress Evidence.

## I.      Background

On the evening of October 3, 2009, the Dallas Police Department received a complaint from

an anonymous 911-caller at approximately 5:31 p.m. The caller stated that a black female in a blue

Chrysler was waving a gun around in the parking lot of the Highland Hills apartment complex.

Dallas police officers Phillip Ralson ("Ralson") and Daniel Lee Harris ("Harris") were immediately

dispatched and arrived at the apartment complex approximately four minutes after receipt of the call.

After approximately two minutes of searching the parking lots, the officers located only one car that

fit the 911-caller's description of a "blue Chrysler." The officers also observed a black female,

Defendant Tarsl Dixon ("Dixon"), in the driver's seat.

Ralson approached the vehicle, and Dixon rolled down her window to talk to him. What

happened next is disputed. Ralson testified at the evidentiary hearing on August 26, 2010, that he

instructed Dixon to turn off her car radio. He further stated that, when Dixon leaned forward to do

so, the front pocket of her hooded sweatshirt opened slightly, allowing Ralson to see the cylinder

of a firearm (a North Arms, Model .22 Long Rifle, .22 caliber revolver).  Finally, he testified that

after he saw the firearm, he asked her to get out of the car.  The arrest report prepared by Harris and

reviewed by Ralson immediately following the incident, however, tells a different story.  The arrest

report states that Dixon was asked to step outside of the vehicle before Ralson saw a firearm.  It

makes clear that he observed a small silver revolver in the pocket of Dixon's hooded sweatshirt only

when she opened the driver's side door to exit the vehicle.  Ralson testified that this was an error

in the arrest report.

The remaining facts are not in dispute.  After Dixon stepped outside of the vehicle, a short

struggle ensued.  The struggle caused the firearm to fall out of her sweatshirt pocket and land

underneath the vehicle.  Harris and Ralson recovered the firearm, and Dixon was arrested.  She was

ultimately indicted on March 2, 2010, on one count for felon in possession of a firearm in violation

of 18 U.S.C. §§ 922(g)(1) and 924(e).

Dixon now moves to suppress the firearm and any other evidence obtained or statements she

made while in police custody.  She contends that she was subject to an illegal seizure in violation

of the Fourth Amendment because Ralson had no reasonable suspicion to order her out of her

vehicle.  She further contends that the anonymous 911-caller's complaint was an unreliable and

insufficient basis to justify Ralson's investigation, and that her car was not "blue" as the 911-caller

indicated.  The government responds that the 911-caller's complaint was reliable and that any

contact between Dixon and Ralson was consensual.

II.     **Legal Standard**

"Searches and seizures of motorists suspected of criminal activity are analyzed under the

framework established in *Terry v. Ohio*, 392 U.S. 1 (1968)."  *United States v. Jaquez*, 421 F.3d 338,

340 (5th Cir. 2005) (citation omitted). "An investigative vehicle stop is permissible under *Terry* only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. An officer's mere hunch or unparticularized suspicion is not sufficient; rather, a minimal level of objective justification for the stop must be present." *Id.* at 340-41 (internal quotations and citations omitted). The burden is on the government to show "the reasonableness of a warrantless search or seizure." *Id.* at 341.

Insofar as relying on an anonymous tip to investigate a suspect for criminal activity, "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). "Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* (citation omitted). "[A]n anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." *Id.* at 274.

III.    Analysis

The court held an evidentiary hearing on August 26, 2010, and has since carefully reviewed the evidence and the testimony. Dixon's argument is twofold. First, she contends that the anonymous 911-caller's complaint was unreliable and insufficient to justify a police investigation. Second, she contends that once the police investigation started, Ralson did not observe her firearm in plain sight and had no justification for ordering her out of the vehicle and detaining her. The court addresses each issue separately.

### A.    Whether the Anonymous Complaint was Reliable

It is undisputed that the 911-caller stated that a black female in a blue Chrysler was waving a gun around in the parking lot of the Highland Hills apartment complex.  Dixon contends that this information is vague and establishes no specific crime or criminal activity.  Further, Dixon contends that she was wrongfully investigated by Ralson because the color of her Chrysler is not even blue.  At the hearing, Dixon produced evidence showing that the color of her car could reasonably be interpreted as "green" instead of blue.  The court determines, however, that the particular color shade of her Chrysler was not so far removed from "blue" on the color spectrum as to render a police investigation groundless.  The color of the vehicle could also be reasonably interpreted as "blue."

The court further determines that the 911-caller's complaint was reliable to the extent that it provided a sufficient description of the person whom the anonymous tipster meant to accuse.  Ralson testified that he performed a visual sweep of all of the parking lots at the apartment complex before determining that Dixon, seated in her Chrysler, was the only subject that fit the 911-caller's description.  He was certainly at liberty to approach the parked vehicle and start a conversation with Dixon, which is what he did.

### B.    Whether the Seizure/Detention was Justified

The court determines, however, that absent "articulable facts that criminal activity may [have been] afoot," Ralson had no justification for ordering Dixon out of her vehicle.  *See Jaquez*, 421 F.3d  at 340.  The court's determination is supported by the testimony of Ralson and Harris and, moreover, the government appears to concede it.  Ralson and Harris both testified that, had Dixon decided not to respond to Ralson and had driven away when he approached, the officers would have had no reason to stop her.  When asked by the court if the officers would have let Dixon go, Harris

responded, "we would have had to." When the court asked Ralson if Dixon would have been free to go, he stated "I would have tried to see if there was some reason to stop her on traffic, but other than that, I had really no other reason."

Although the government argues that all contact between Dixon and Ralson was consensual, including Dixon's acquiescence to Ralson's "request" that she exit the vehicle, the court determines that whether Ralson's "request" was actually a question or an order is a distinction without a difference. Upon inquiry by the court, the government essentially conceded that a reasonable person in Dixon's position would not have believed she was free to go when "asked" by Ralson, a police officer dressed in full uniform with a holstered side firearm, to step outside of the car. That a reasonable person would believe that she is free to leave after being "asked" by an armed police officer in uniform with the ability to enforce that "request" strains credulity. More precisely, such a belief would be a fantasy, and fantasies are apt to take us with Alice into Wonderland.[1]  A reasonable person would have believed she had no choice but to exit the vehicle. The court accordingly cannot say that Dixon *consented* to exiting the vehicle when "asked" by Ralson. This, coupled with Ralson's and Harris's testimony that Dixon would have been free to go before being asked to step outside her car, solidifies the court's determination that ordering Dixon out of the vehicle constituted a "seizure" under *Terry*, and that such seizure could only be justified by articulable facts of criminal activity.

Ralson testified that there *was* an articulable fact indicative of criminal activity before he ordered Dixon out of the car: his observation of Dixon's firearm. This, however, does not square

---

[1]In response to the court's inquiry on what a reasonable person would do, the government's attorney stated, "I would get out of the car and talk to the officer. I would say I would do the same thing as Ms. Dixon did, get out of the car."

with the arrest report. The arrest report states that Ralson observed the firearm as Dixon opened the door to get out of the car, only *after* she had been ordered out of the vehicle.[2] Harris unequivocally testified that he did not see the firearm at all until after Dixon was outside of her vehicle and the weapon fell to the ground. The court accordingly determines that resolution of this matter turns solely on credibility, and that its acceptance of one version of events precludes its acceptance of the other. The arrest report and Ralson's testimony cannot both be correct.

If the court accepts the arrest report as written, Ralson had no basis to order Dixon out of the vehicle, and the seizure was unreasonable under *Terry* and violated the Fourth Amendment. On the other hand, if the court accepts Ralson's testimony as stated, he had a sufficient basis for ordering Dixon out of the vehicle after observing the firearm, which would have been a reasonable seizure under *Terry* and not a violation of the Fourth Amendment.

Although Ralson testified that the arrest report is erroneous, the court is puzzled that such a critical error would have gone unnoticed and uncorrected for so long. This seemingly small difference in detail between the arrest report and Ralson's testimony is actually of sizeable magnitude, and it is the linchpin upon which the court's decision turns. Harris testified that he prepared the arrest report and that Ralson reviewed and submitted it. Testimony also established that the jail sergeant at the book-in desk reviewed the arrest report prior to its submission. Ralson testified that the error was not brought to his attention until two weeks before the court's August 26, 2010 evidentiary hearing, and that it was the government (not his police superiors) who spotted it.

---

[2]The court recognizes that a portion of the arrest report supplement states that Harris observed the gun in plain sight while Dixon was seated in the car. This particular portion of the arrest report is contained in the affidavit for an arrest warrant filed by Officer S.W. Griffis. It is clear to the court that this statement is incorrect because it contradicts the plain language of the narrative portion of the arrest report and incorrectly summarizes its key provisions. Griffis was not present when Dixon was arrested.

Ralson further testified that he is certain there is a way to supplement or amend arrest reports for errors, but that he does not know the process for doing so. The narrative portion of the arrest report was never amended, supplemented, or otherwise corrected.

The events giving rise to this case occurred on October 3, 2009, and the arrest report was prepared on the same day. More than ten months passed before Ralson first learned of the error in the arrest report. The court can reasonably infer that Ralson has conducted or been involved with numerous arrests and investigations since the evening of October 3, 2009. In light of this, the court questions how Ralson's memory as to this single incident could be so crystal clear insofar as recalling that he saw the firearm *before* ordering Dixon out of the vehicle, when the arrest report expressly states the contrary. As a practical matter, observations that are recorded in a closer temporal proximity to the event in question are more likely to be an accurate depiction of events, and one's memory is much more likely to fade with the passage of time.

Ralson acknowledged the need for accuracy in preparing arrest reports and the reality that such reports could be used in subsequent court proceedings. The incentive to reflect accurately the sequence of events is therefore compelling. Further, there is a natural tendency to record events in the order that they occur. For these reasons, the court finds that the sequence of events in the arrest report more likely reflects what happened on October 3, 2009, and is therefore more reliable than what Ralson tries to recollect after ten months.

Ralson's testimony at the hearing also sheds light on his motivation for investigating Dixon: he wanted to detain her until he found something of a criminal nature. Ralson explicitly stated that he "would have tried to see if there was some reason to stop her on traffic," had she driven away. This motive undermines his credibility.

Further, the court is unpersuaded that Ralson was even able to observe the firearm as he described from his vantage point on the driver side of Dixon's vehicle. The government stipulated that Dixon is right-handed, which suggests that she would have placed the gun in the right opening of her sweatshirt pocket. Ralson could have only seen the left opening of the pocket from where he was standing. The gun itself is extraordinarily tiny, no longer than the palm of an average-sized person's hand. The gun is slightly under four inches long overall, has a barrel that is one and one-eighth inches long, has a cylinder that is three-fourth inch wide and one and one-eighth inches long. It would not have created a recognizable bulge in the pocket, especially in the type of hooded sweatshirt that Dixon was wearing, and it is unlikely that it could have been seen from the left if it had been placed in the pocket's right side. Ralson's insistent statement that he observed *only* the "cylinder" of the gun—as opposed to the barrel or the handle, a portion of the barrel and cylinder, or a portion of the handle and cylinder—makes the court further question his testimony.[3] The court is uncertain how only the cylinder (the middle part of the gun) could be seen under the circumstances without also observing the gun's front or back end. Ralson provided no testimony that there were any other objects in Dixon's sweatshirt pocket that obscured his view of the barrel or handle, leaving only the cylinder exposed.

---

[3]The government, in its response to Dixon's motion to suppress, acknowledges that there is an error in the arrest report. The arrest report states that Ralson observed the firearm after ordering Dixon out of the vehicle. In its acknowledgment, the government states that, after meeting with Ralson, he recalled seeing the gun *barrel* first, and then asked Dixon to step out of the vehicle. This acknowledgment offers no assistance to the government's position because Ralson repeatedly and insistently testified at the hearing that he saw only the *cylinder* of the gun. The cylinder and the barrel of a revolver, of course, are two distinct parts of the firearm. The barrel is the hollow passage or tube that allows for discharge of a bullet or cartridge. The cylinder is the revolving portion that is chambered to hold the bullets or cartridges. The court reasonably infers that a police officer of five years such as Ralson knows the difference between the two. The government's acknowledgment therefore serves only to further undermine the version of events to which Ralson testified at the hearing.

As previously stated, the government has the burden of showing the reasonableness of a warrantless search or seizure. *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995). Under the totality of the circumstances, and for the reasons herein stated, the court determines that the government has failed to carry its burden and show that Ralson's seizure of Dixon was reasonable. The government's evidence does not establish that Ralson observed the firearm in Dixon's possession before he ordered her out of the vehicle.

## IV.     Conclusion

For the reasons stated herein, the court **grants** Defendant Tarsl Dixon's Motion to Suppress Evidence. Accordingly, the North Arms, Model .22 Long Rifle, .22 caliber revolver, serial number L10672, recovered by the officers on October 3, 2009, and any other evidence seized or statements made by Dixon while in police custody will be **excluded** at trial. During trial, the government will not be permitted to admit, produce, or refer to any evidence seized or statements made as a result of the October 3, 2009 arrest.

**It is so ordered** this 3rd day of September, 2010.

Sam A. Lindsay
United States District Judge